IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SELECTIVE INSURANCE COMPANY OF
SOUTH CAROLINA,

    Plaintiff,

v.

ASSISTED LIVING WELL
COMPASSIONATE CARE LLC, ET AL.,

    Defendants.

Civil No. 23-3449-BAH

## MEMORANDUM OPINION

Plaintiff Selective Insurance Company of South Carolina ("Selective") initiated suit against Assisted Living Well Compassionate Care ("ALWCC"), Country Home LLC ("Country"), Country Home 2 LLC ("Country 2"), Country Home 3 LLC ("Country 3"), JHTM LLC ("JHTM"), and Group Home on Gibson Island LLC ("Group Home") (collectively "Defendants" or "Affiliates") seeking declaratory relief. ECF 1. On February 20, 2024, Defendants filed a counterclaim against Selective as well as a third-party claim (the "Claim") against HUB International Mid-Atlantic, Inc. ("HUB"). ECF 12. Pending before the Court is HUB's motion to dismiss Defendants' third-party complaint. ECF 21. Defendants filed an opposition, ECF 30, and HUB filed a reply, ECF 34. All filings include memoranda of law, while Selective's complaint and Affiliates' third-party complaint include exhibits.[1] The Court has reviewed all relevant filings

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, HUB's Motion is **DENIED**.

I.  **BACKGROUND**

As the operative motion before the Court solely concerns Affiliates' claims against HUB, the facts are drawn from Affiliates' third-party complaint. *See AIG Eur. Ltd. v. Gen. Sys., Inc.*, Civ. No. RDB-13-0216, 2013 WL 6654382, at *1 (D. Md. Dec. 16, 2013) (citing *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011)).

A.  **Construction of the Property**

In March 2020, Group Home purchased a property at 1753 Banbury Road on Gibson Island in Maryland ("the 1753 Building"). ECF 12, at 8 ¶ 17. The property was intended for use as ALWCC's business headquarters and as an overnight accommodation for disabled seniors. *Id.* Exterior construction work on the property began on March 4, 2020, though the work was halted on May 28, 2020 by order of Judge Bennett, in light of a dispute between Group Home and Gibson Island Corporation ("GIC"), the homeowners' association for the island. *Id.* at 9 ¶ 20 (citing *Gibson Island Corp. v. Group Home on Gibson Island LLC*, Civ. No. 1:20-00842-RDB, ECF 28).[2] Once the homeowners' association approved the existing work on November 2, 2020, exterior construction resumed. *Id.*

Meanwhile, interior renovations continued uninterrupted from March 4, 2020 through the week of June 12, 2023. ECF 12, at 9 ¶ 21. However, Group Home was waiting to finalize the construction work until Judge Griggsby issued a ruling in another case between Group Home and GIC, this one involving whether GIC's restrictions on use of the 1753 Building violated the Fair Housing Act ("FHA"). *Id.* at 10 ¶ 23 (citing *Group Home on Gibson Island, LLC v. Gibson Island*

---

[2] Judge Bennett ordered Group Home to refrain from further construction until proper consultation with GIC. *See Gibson Island Corp*, No. 1:20-cv-00842-RDB, ECF 28, at 1.

2

*Corp*, No. 1:20-cv-000891-LKG).[3] Group Home anticipated that the remaining interior work could be completed within thirty days after a ruling in the FHA case. *Id.* ¶ 24.

While construction was ongoing at the 1753 Building, ALWCC alleges that it continued to use the property as its business headquarters. ECF 12, at 10 ¶ 25. ALWCC's president and CEO, Craig Lussi, used the space as his primary office for conducting ALWCC's day-to-day business, which involved managing the company, holding meetings, performing employee trainings, and giving tours to prospective residents and buyers. *Id.* at 10–11 ¶ 26. From March 4, 2020, Lussi also used the 1753 Building as headquarters for the business operations of Country, Country 2, Country 3, JHTM, and other related entities. *Id.* at 11 ¶ 27. Affiliates also allege that "Hunter Lussi, [] Lussi's son . . . also work[ed] for ALWCC in the 1753 Building nearly every day other than when performing site visits to other ALWCC managed properties." *Id.* at 11 ¶ 28.

## B. Insurance of the Property

Before purchasing the 1753 Building, Affiliates "obtained a Selective Builders Risk policy effective March 4, 2020." ECF 12, at 11 ¶ 29. This policy was secured "through HUB's insurance brokerage team, who," Affiliates claim, "have had a special insurance brokerage relationship with the ALWCC companies and the Lussis for at least 18 years." *Id.* On February 25, 2021, before the Builders Risk policy was set to expire in March, Group Home, communicating through HUB, advised Selective that it anticipated construction would be complete in April 2021, and Selective extended the policy for another year. *Id.* ¶ 30. In February 2022, prior to the expiration of the

---

[3] On November 16, 2023, Judge Griggsby granted GIC's motion for summary judgment, denied Group Home's cross-motion for summary judgment, and dismissed Group Home's complaint. *See Grp. Home on Gibson Island, LLC v. Gibson Island Corp.*, Civ. No. 20-00891-LKG, 2023 WL 8004886, at *1 (D. Md. Nov. 16, 2023). Group Home filed an appeal with the Fourth Circuit, where the case is currently pending.

3

extended policy, HUB indicated that construction was expected to be complete in the summer of 2022, and the policy was again extended for another year. *Id.* ¶ 31.

Before the policy was set to again expire in March 2023, HUB contacted Group Home to inquire about the status of the project. ECF 12, at 12 ¶ 32 (citing ECF 12-2, at 1–2) (email correspondence between Lussi and HUB). Lussi responded on February 12, 2023 to say that construction was thirty days from completion and required only some repainting, electrical finishings, elevator assembly, and safety inspections. *Id.* (citing ECF 12-2, at 1). He further indicated that he expected a ruling from Judge Griggsby imminently and included some documents related to the FHA case as an attachment.[4] *Id.* (citing ECF 12-2, at 1; ECF 12-2, at 4–69). Jason Lacayo, an employee at HUB, responded to Lussi's email to say that he would discuss the situation with Selective and thereafter present Lussi with policy options, noting that "the policy cancels in 30 days." *Id.* ¶ 33 (citing ECF 12-3, at 1) (further email correspondence between Lussi and HUB). On February 17, 2023, Lacayo emailed Lussi again and noted that if Selective would "not agree to extend for [thirty] days" on the Builders Risk policy, Affiliates could "move to a vacant building policy" with "limited terms." *Id.* ¶ 34 (quoting ECF 12-4, at 3) (additional email correspondence between Lussi and HUB). Lussi responded that though the building did not yet have live-in residents, "all the improvements are in place." *Id.* ¶ 35 (quoting ECF 12-4, at 2). Lussi reiterated, however, that the building was not vacant as he worked there "every day." *Id.* In reply, Lacayo said "[t]his will help" but noted that "[s]ome carrier guidelines will require the location to [be] occupied and operating as intended. In this case, occupied beds." *Id.* ¶ 36 (quoting ECF 12-4,

---

[4] In the Claim, Affiliates purport to attach a copy of the court documents as an exhibit at ECF 12-2. ECF 12, at 28 ¶ 24 (citing ECF 12-2). The Court notes that documents from both the case before Judge Griggsby and the case before Judge Bennett are included; the first at ECF 12-2, 4–51 and the second at ECF 12-2, 52–69. The Court understands Affiliates' reference to "the FHA" case as meaning the case before Judge Griggsby, No. 1:20-cv-00891-LKG.

4

1). Lacayo closed, however, by pledging that HUB would "leverage [Lussi's] comments to get past the obstacle." *Id.*

On February 23, 2023, Claire Kilchenstein at HUB emailed Jacqueline "Dee" Budd at Selective to communicate that the project was nearing completion, that the building was permitted and verified as a group home by Anne Arundel County, and that Lussi was currently occupying a room as his office and doing staff training there. ECF 12, at 13 ¶ 37 (citing ECF 12-5, at 3) (email correspondence between HUB and Selective). Kilchenstein requested a quote based on this information, though Affiliates allege "this email did not attach the FHA case information provided by Mr. Lussi" in his February 12 email to HUB. *Id.* Affiliates also attest that "Selective did not respond to this email and did not request any additional information, ask any questions about the information provided, inquire concerning the FHA Case, or request an inspection of the 1753 Building or the ongoing construction work." *Id.* ¶ 38.

On February 28, 2023, a few days before the expiration date of the Builders Risk policy, Kilchenstein again emailed Budd and requested coverage for the 1753 Building in the amount of $2,500,000 for the building itself, $300,000 for the contents, and $1,000,000 for business income. *Id.* ¶ 39 (citing ECF 12-6, at 2–3) (further email correspondence between HUB and Selective). Selective set up the endorsement the same day and processed it on March 4, 2023. *Id.* at 14 ¶¶ 40–42. The building was insured under a Selective Commercial Package Policy ("the Policy"). *Id.* ¶ 42. Kilchenstein emailed Lussi a copy of the endorsement on March 10, 2023, "adding [the] 1753 Building to the Selective policy effective March 4, 2023" and listing its "occupancy as 'Assisted Living.'" *Id.* ¶ 43 (citing ECF 12-7, at 1) (email correspondence between HUB and Lussi).

The Policy had an original expiration date of May 6, 2023. ECF 12, at 14 ¶ 43. Upon expiration, Selective renewed the Policy, effective through May 6, 2024. *Id.* ¶ 44. The Policy

provided blanket building coverage with a limit of $6,861,463 for damage to "Covered Property" resulting from a "Covered Cause of Loss," including "direct physical loss unless the loss is excluded or limited in the policy." *Id.* ¶¶ 46–47. The named insured under the Policy were ALWCC, Country, Country 2, Country 3, JHTM, and Group Home. *See* ECF 1-1, at 21 (copy of the Policy). The Policy covered, "among other things, the [1753 Building.]" ECF 12, at 14 ¶ 45.

### C. The Loss

On June 20, 2023, Affiliates indicate that "a claim for water damage was reported to Selective." ECF 12, at 15 ¶ 48. Affiliates attest that a large mirror had evidently detached from the wall outside a third-floor bathroom in the 1753 Building and "shear[ed] off two water supply lines and a waste line" when it fell. *Id.* Consequently, the whole property flooded. *Id.* Affiliates do not know how long the flooding lasted, as no one was in the building from the evening of Friday, June 16th through the morning of Tuesday, June 20th, over the Juneteenth holiday weekend. *Id.* ¶ 49. The flooding caused "severe damage" throughout the property, including to fittings, electrical systems, safety systems, floors and ceilings, and light fixtures. *Id.* ¶ 50. Upon notification of the loss, Selective authorized Lussi to hire a company called Flood Solutions to provide immediate intervention and clean-up services. *Id.* at 16 ¶ 54.

The following day, on June 21, 2023, the Selective Claims Team adjuster Phil Smith inspected the damage to the 1753 Building. ECF 12, at 16 ¶ 55. During the inspection, he informed Lussi that "[t]he normal process [] after mitigation is done using [Selective's] estimate to complete the repair estimate" and that Selective would then pay Lussi as the policyholder "to get everything repaired." *Id.* Affiliates further indicate that Smith told Lussi, "[c]learly the pipe broke suddenly[,] [c]learly it was the mirror. That's a sudden pipe loss[,] [t]hat's a covered loss in my opinion." *Id.* Two days later, on June 23, 2023, the Claims Team from Selective emailed HUB to advise that the Team had met with Lussi and confirmed onsite the Team's belief that the flood was "a covered

6

loss" and that hiring "a water mitigation company, Flood Solutions, was the proper way to mitigate damages." *Id.* ¶ 56 (citing ECF 12-9, at 2). On June 27, Steven Claudio, another adjuster from the Selective Claims Team, called Lussi to continue investigation of the claim. *Id.* ¶¶ 56–57. Claudio came to inspect the property on June 29. *Id.* During the inspection, Claudio again informed Lussi that the loss would be covered. *Id.* at 17 ¶ 59.

However, on July 7, 2023, Selective sent Lussi a reservation of rights letter stating that it was "unable to determine whether coverage was available, citing the vacancy provision in the Policy[.]" ECF 12, at 17 ¶ 61 (citing ECF 1-2) (reservation of rights letter). Selective requested additional information and documentation and advised that it was continuing its investigation. *Id.* Affiliates quote the relevant portion of the Policy as stating, "[i]f the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs," Selective "will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss," including water damage. *Id.* at 18 ¶ 62 (quoting ECF 1-1, at 79). The Policy defines a "vacant" property as one wherein less than 31% of the total square footage is "[u]sed by the building owner to conduct customary operations." *Id.* (quoting ECF 1-1, at 79). Affiliates dispute that the 1753 Building was vacant at the time of loss, as the "entire 8,500 square foot building was and is continuously utilized by" Lussi and his son for business operations as well as Lussi's disability therapy. *Id.* ¶ 63. Affiliates also attest that the 1753 Building was not vacant because Lussi and his family were continually performing construction work on the property. *Id.* ¶ 64. Per Affiliates, "[t]he occupancy status of the 1753 Building at the time of the Loss was exactly as it was represented to HUB by Mr. Lussi and from HUB to Selective" at the time Selective was deciding whether and how to provide coverage for the 1753 Building. *Id.* at 19 ¶ 65.

7

On July 10, 2023, American Builders Corp. estimated the cost to repair the 1753 Building to its pre-loss condition at $2,534,727 to $3,622,741. ECF 12, at 15 ¶ 51 (citing ECF 12-8, at 6). On July 24, 2023 Group Home received a letter from the firm Robinson & Cole advising that the firm had been retained as coverage counsel for Selective and was assisting in the coverage investigation. *Id.* at 19 ¶ 66. Group Home responded to Selective's reservation of rights letter on August 10, 2023 "and provided the additional information and documentation requested" by Selective. *Id.* ¶ 67 (citing ECF 12-10). Additionally, "Lussi provided an Examination Under Oath on November 16, 2023." *Id.* ¶ 68. "Relying on the [Policy's] vacancy provision," Selective issued a letter denying coverage on December 20, 2023. *Id.* ¶ 69.

Affiliates allege the 1753 Building, "sustained $2.5 to $3.6 million of damage" and further aver that,

> the Lussis continue to perform their customary business operations for ALWCC from the 1753 Building, [but] approximately 50% of the building is a forest of see-through wooden stud walls, permanently damaged electrical, HVAC, smart house systems and equipment, and water-soaked wood and aluminum foil lined floors and ceilings with 8,000 linear feet of exposed underfloor heating pipes as Group Home has been unable to completely mitigate and repair the 1753 Building, despite having procured an all-risk and commercial property insurance policy to protect it against such losses.

ECF 12, at 19 ¶ 71.

### D. Procedural History

Contemporaneous with the denial of coverage, Selective filed suit seeking a declaratory judgment stating that "Selective has no duty to indemnify, or otherwise compensate [Affiliates] for the Claim, because the Claim is excluded from [] coverage" under the terms of the Policy. ECF 1, at 7. On February 20, 2024, Affiliates answered Selective's complaint and brought a counterclaim against Selective as well as the third-party claim against HUB alleging negligence and negligent representation, the claims at issue in this motion. *See* ECF 12.

## II. **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.,* 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.,* 767 F.3d 379, 396 (4th Cir. 2014).

The Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan,* 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC,* 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

## III. ANALYSIS

Affiliates' third-party complaint alleges breach of contract and bad faith on the part of Selective. ECF 12, at 20–23 ¶¶ 72–93. In the event that the Court determines Selective's denial of coverage was proper, Affiliates allege that the Court should find that "HUB failed to procure the appropriate coverage." *Id.* at 7 ¶ 4. To that end, Affiliates specifically allege negligence and negligent misrepresentation on the part of HUB. *Id.* at 23–27 ¶¶ 94–117.

### A. Affiliates Sufficiently State a Claim for Negligence

Affiliates argue that HUB "had a duty to properly and competently advise . . . and to properly and competently obtain the coverage it represented was available to insure the 1753 Building." ECF 12, at 24 ¶ 102. HUB breached that duty, Affiliates assert, "when it failed to obtain Selective the appropriate insurance to protect the 1753 Building from the risk of loss" and when it "failed to provide Selective with appropriate information concerning the 1753 Building and in binding the Policy that categorized the occupancy of the 1753 Building as 'Assisted Living' even while Defendants were awaiting a decision in the FHA Case." *Id.* at 24–25 ¶¶ 104–105. Finally, Affiliates attest that "as a direct and proximate result of HUB's negligent acts and omissions," they continue "to suffer losses in the form of property damages, repair costs, additional expenses, and other chargeable losses and compensatory damages." *Id.* at 25 ¶ 106.

"Under Maryland law, a plaintiff must establish four elements to prove negligence: '(1) a duty owed by the defendant; (2) a breach of that duty by the defendant; (3) a legally cognizable causal relationship between the breach of duty and the harm suffered; and (4) damages.'" *Bowman v. Select Portfolio Servicing, Inc.*, 704 F. Supp. 3d 633, 658 (D. Md. 2023) (*citing McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 104–05 (D. Md. 2010) and *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 758 (Md. 1986)).

10

HUB argues that Affiliates have failed to meet their burden of alleging negligence because they do not allege "that HUB was engaged to assist them in procuring insurance in the event the daily business operations described by Mr. Lussi changed or were suspended after March 4, 2023." ECF 21-1, at 7–8. Affiliates respond that Lussi "did not demand that HUB obtain any particular sort of insurance coverage" but only "explained the facts concerning the status of the 1753 Building." ECF 30, at 9 (citing ECF 12-2). Further, Affiliates contend that the communication between Lussi and Lacayo does not show that Lussi "rejected a vacant building policy" and argue that Lussi, not being an insurance broker, would not know what would even potentially constitute a "vacant" building under an insurance policy. *Id.* at 10. Fundamentally, Affiliates argue,

> [t]o the extent that HUB did not communicate to Selective the exact circumstances of the 1753 Building—that Mr. Lussi was maintaining an office at the 1753 Building while awaiting a decision in the FHA case to allow Group Home to start accepting overnight residents—and did not itself consider whether such circumstances would have meant the 1753 Building was better-suited for a different type of coverage than being added to the existing Selective commercial policy, HUB breached the duty it owed to Group Home to exercise reasonable care and skill when procuring insurance coverage.

*Id.* at 11. In reply, HUB suggests that Affiliates misrepresented the nature of the usage of the property, or else that the use of the property changed after the policy was issued, and that HUB therefore cannot be liable for failing to procure an insurance policy that the insured "never requested but later needed." ECF 34, at 6 (quoting *Schlossberg v. B.F. Saul Ins. Agency of Md., Inc.*, 148 F. Supp. 3d 462, 465 (D. Md. 2015)).

The Court does not agree with HUB's characterization of Affiliates' position. Affiliates do not claim that they later needed a vacant building policy that they did not originally ask for; instead, Affiliates argue that HUB failed to procure proper coverage based on the entirety of the facts provided by Lussi to HUB. Further, Affiliates' third-party complaint specifically maintains, contrary to HUB's suggestion, that the entirety of the 1753 Building "was and is continuously used

11

by Craig Lussi because of his disability and daily therapy" as well as for "conducting the customary operations of ALWCC" alongside his son and other members of his family. ECF 12, at 18. The third-party complaint additionally details that Lussi and his family were "continuously performing construction work, albeit at a slow place," so that the building would be ready to accept overnight disabled senior renters in the event of a favorable decision in the FHA case then pending before Judge Griggsby. *Id.* Nowhere in the third-party complaint do Affiliates contend that HUB negligently failed to predict the building would become vacant, and indeed they deny it ever *was* vacant. Instead, they claim that HUB negligently failed to procure proper coverage on the basis of all the facts provided by Affiliates, including the unchanged occupancy and use status of the 1753 Building.

Apart from the argument detailed above, HUB does not contest any other element of Affiliates' negligence claim. Therefore, taking all facts alleged in the third-party complaint as true, and construing them in the light most favorable to Affiliates, the Court determines that Affiliates have stated a plausible negligence claim. They have sufficiently alleged facts for all four elements of a claim for negligence under Maryland law. As to the first factor, Affiliates have alleged that HUB owed them a duty as the parties to be insured. *See* ECF 12, at 24 ¶¶ 101–03. Affiliates even allege that they had a "special insurance brokerage relationship" with HUB for many years. *Id.* at 11 ¶ 29. Moreover, Affiliates argue that HUB breached its duty by failing to procure appropriate insurance on the basis of the facts provided by Lussi. *Id.* at 24–25 ¶¶ 104–05. Affiliates further argue that the breach "direct[ly] and proximate[ly]" caused an injury, the uncovered loss, and further aver that the suffered injury in the amount of property and monetary losses. *Id.* at 25 ¶ 106.

**B.     Affiliates Sufficiently State a Claim for Negligent Misrepresentation**

Affiliates also claim that HUB negligently misrepresented that it "had bound a policy of insurance that would insure the 1753 Building from May 6, 2023 through May 6, 2024" and that HUB "knew or should have known that these representations were false as it carelessly and negligently bound the Policy despite not having thoroughly and accurately communicated to Selective" the status of the 1753 Building. ECF 12, at 26 ¶¶ 110, 113. They argue that HUB made this negligent misrepresentation "with the understanding that Defendants would rely upon them and not seek any further insurance coverage elsewhere" and that Defendants "did in fact reasonably rely upon these misrepresentations by HUB and did not purchase any additional insurance coverage for the 1753 Building." *Id.* ¶¶ 114–15.

"[I]n its most general sense, negligent misrepresentation arises when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff." *Doe v. Cath. Relief Servs.*, 529 F. Supp. 3d 440, 452 (D. Md. 2021) (quoting *Griesi v. Atl. Gen. Hosp. Corp.*, 765 A.2d 548, 553 (Md. 2000)). Under Maryland law, the five elements of negligent misrepresentation are:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Newton v. Kenific Grp.*, 62 F. Supp. 3d 439, 442 (D. Md. 2014) (citing Weisman v. Connors, 540 A.2d 783, 791 (Md. 1988)).

HUB argues that Affiliates fail "to identify any false representation alleged to have been made by HUB, any reasonable reliance on the part of the Defendants, and otherwise fail[] to allow for any inference that[,] but for a statement(s) made by HUB[,] additional coverage for a vacant

13

building would have been purchased" that would have covered the flood loss. ECF 21-1, at 10. HUB evidently construes Affiliates' claim as one asserting that HUB knew or should have known that the building would become vacant and therefore should have procured vacant building coverage. *Id.* (arguing that Affiliates' allegations confirm they knew "the Property was or might become vacant, and that vacant building coverage might be needed"). HUB concludes that the negligent misrepresentation claim must be dismissed because Affiliates "do not allege (nor can they) that they ever shared that knowledge with HUB or requested that HUB assist them in procuring that additional coverage." *Id.*

As it does with Affiliates' negligence allegation, HUB misapprehends the substance of Affiliates' negligent misrepresentation claim. Nowhere in the third-party complaint, nor indeed in Affiliates' response to the motion to dismiss, do Affiliates argue that HUB knew or should have known that the 1753 Building would become vacant, nor that HUB negligently misrepresented that they would procure such a policy. Instead, as noted above, Affiliates allege explicitly that "[t]he occupancy status of the 1753 Building at the time of the Loss was exactly as it was" at the time Affiliates were communicating with Selective and HUB about coverage options. ECF 12, at 19 ¶ 65.

Moreover, Affiliates clearly and specifically allege that HUB made a false statement when it "represented that it had bound a policy of insurance that would insure the 1753 Building from May 6, 2023 through May 6, 2024." ECF 12, at 26 ¶ 110. They further sufficiently allege that HUB owed them a duty, that HUB both intended and anticipated that Affiliates would rely on the representation that the Policy provided sufficient coverage, that Affiliates did rely on the representation, and that Affiliates suffered damages proximately caused by the allegedly negligent

14

misrepresentation. *Id.* at 26–27 ¶¶ 109–117. The Court therefore concludes that Affiliates have stated a claim for negligent misrepresentation under Maryland law.

### C. Affiliates' Claims are Ripe

In its reply, HUB briefly contends that Affiliates' claims are unripe, as they "will come to life only if a judgment is entered against them in favor of Selective—*e.g.*, the Court rejects their argument that the Property was not 'vacant' at the time of the loss." ECF 34, at 3–4. It argues that Affiliates appear to acknowledge as much in the third-party complaint. *Id.* (quoting ECF 12, at 7 ¶ 4) ("Either HUB performed its duties and procured the appropriate coverage, which Selective is wrongfully denying, or HUB failed to procure the appropriate coverage and Selective's denial is appropriate.").[5]

"The doctrine of ripeness arises from the case or controversy requirement of Article III" and therefore "presents the threshold question whether a claim is justiciable." *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022). "The Plaintiff bears the burden of establishing ripeness." *Id.* "Thus, while [the Court has] a burden to *address* Article III jurisdiction sua sponte, the burden remains on Plaintiffs to *demonstrate* that the claim is ripe." *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022) (emphasis in original) (citing *Renne v. Gary*, 501 U.S. 312, 316 (1991)) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record."). "While standing involves 'the question[] of *who*

---

[5] "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006). However, "[r]ipeness implicates the court's subject matter jurisdiction, and 'questions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised sua sponte by the court[.]'" *Suchin v. Fresenius Med. Care Holdings, Inc.*, 715 F. Supp. 3d 703, 711 (D. Md. 2024) (quoting *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004)) (additional citation omitted). "Thus," HUB "cannot have waived the ripeness argument, as it was never its argument to waive." *Id.* (citing *Hamilton v. Pallozzi*, 165 F. Supp. 3d 315, 320 n.8 (D. Md. 2016)). Accordingly, the Court will consider the argument despite HUB's tardiness in raising it.

may sue,' ripeness involves '*when* they [may] sue." *Id.* (quoting *South Carolina v. United States*, 912 F.3d 720, 720 (4th Cir. 2019)) (emphasis in *Wild Virginia*).

Facially, Affiliates' claim against HUB does appear that it is based on a hypothetical, namely, whether this Court will determine that Selective validly denied coverage under the terms of the Policy. However, other district courts around the country have held that a third-party complaint does not implicate ripeness concerns where, as here, a denial of coverage, and thus an injury, has actually occurred. *See SOME, Inc. v. Hanover Ins. Co.*, Civ. No. 21-493, 2021 WL 2935893, at *6 (D.D.C. July 13, 2021) (determining that there were no "contingencies or hypotheticals" in a third-party complaint against an insurance broker where the insured sufficiently plead "injury and loss" as a result of denial of coverage); *see also Netherlands Ins. Co. v. Macomb Cmty. Unit Sch. Dist. No. 185*, No. 18-CV-4191, 2019 WL 5420260, at *5 (C.D. Ill. May 2, 2019) (holding that a third-party claim against an insurance broker was ripe because it concerned "a contingency that the [complaint] alleges actually came to pass" and that the insured "sufficiently alleg[ed] the existence of an actual controversy" when it alleged that the policy "did not provide required coverage"); *cf. Wausau Underwriters Ins. Co. v. Cont'l Cas. Co.*, No. CV-07-0056, 2008 WL 793618, at *3 (E.D. Wash. Mar. 24, 2008) (finding a third-party claim against an insurance broker for failing to procure appropriate coverage was not ripe because the insurer had not actually denied coverage and thus the insured had "suffered no injury").

As other courts have determined, a ripeness analysis is not necessarily impacted just because a party "may have pled claims in the alternative against two different parties." *SOME, Inc.*, 2021 WL 2935893, at *4 (citing Fed. R. Civ. P. 8(d)(3)) ("A party may state as many separate claims . . . as it has, regardless of consistency."). Here, the two separate claims concern the same operative question: whether the insurance policy in question covered the loss at the 1753 Building.

*See Netherlands Ins. Co.*, 2019 WL 5420260, at *5. The contingencies that the ripeness doctrine cautions against are not present here, where the only uncertainty is how the Court will evaluate the Parties' competing claims, not whether any injury or other determinative predicate has occurred. No party disputes that coverage was denied, therefore, the case is ripe for adjudication.

## IV.  **CONCLUSION**

For the foregoing reasons, HUB's motion to dismiss the third-party complaint is DENIED.

A separate implementing Order will issue.

Dated: February 18, 2025                                        /s/
                                                                                Brendan A. Hurson
                                                                                United States District Judge